IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| IN THE MATTER OF THE SEARCH OF:<br><br>ONE APPLE IPHONE, WITH ASSIGNED PHONE NUMBER (412) 607-7675, AND CURRENTLY IN THE POSSESSION OF PRASAD MARGABANDHU | Magistrate No. 24-242<br><br>**[UNDER SEAL]** |
|---|---|

### AFFIDAVIT IN SUPPORT OF
### APPLICATION FOR A SEARCH WARRANT

I, Jared L. Berken, being first duly sworn, hereby depose and state as follows:

I.     **INTRODUCTION AND AGENT BACKGROUND**

1.     I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. As a federal law enforcement officer, I am authorized to investigate violations of laws of the United States, including the crimes outlined herein, and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

2.     I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") having been so employed for approximately two and a half years. As a Special Agent, I have received training in federal firearms, arson, and explosive laws and regulations at the ATF National Academy and Federal Law Enforcement Training Center's Criminal Investigator Training Program.  This training lasted for over six months and covered topics including federal criminal statutes, interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics,

undercover techniques, search warrant applications, and various other investigative techniques. I regularly refer to state and federal firearms and arson laws and regulations during the course of my duties. Prior to my employment with ATF, I was a Patrol Officer for the Aberdeen Police Department in the State of Washington for approximately four years as well as a Patrol Deputy for the Grays Harbor County Sheriff's Office in the State of Washington for approximately eleven months. During this time I made several hundred arrests, based on both warrants and newly developed probable cause, leading to convictions for various offenses including felony and misdemeanor crimes of violence, firearms violations, drug law violations, and traffic violations. Additionally, I have served as a commissioned officer in the United States Army Reserve since 2013, where I currently hold the rank of Captain. In 2018, I graduated from the U.S. Army's Military Intelligence Basic Officer Leadership Course at Ft. Huachuca, Arizona. In 2022, I graduated from the U.S. Army John F. Kennedy Special Warfare Center and School's Civil Affairs Captain's Career Course ranked 6 of 46 students at Ft. Bragg, NC.

3.     As a Special Agent with the ATF, I have experience in and am responsible for investigating violations of federal firearms, arson, and drug laws. In the course of my training and experience, I have become familiar with the methods and techniques associated with the possession and distribution of firearms and drugs, and the organization of firearms and drug conspiracies. I have also become familiar with methods for setting fires and motives for doing so. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants/cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications, conducting court-authorized wire and oral

interception electronic surveillance, and preparing and executing search/arrest warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 USC § 844(i) (Arson of Property in Interstate Commerce), 18 USC § 844(n) (Conspiracy to Commit Arson), and 18 USC § 1341 (Mail Fraud) have been committed, and that here is also probable cause to search the items described in Attachment A for evidence, instrumentalities, contraband, or fruits of this crime.

6.      I am aware that evidence of federal crimes, including arson, firearm, and drug crimes, can often be found in electronic media, including cellular telephones. Such evidence can be found throughout a cellular telephone, such as in text messages, contact lists indicating the names and numbers of associates, call/text logs indicating calls/texts made to and received from associates, online search history files, and photograph and video gallery files. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones has quickly become less clear. Actions such as internet searching or emailing, in addition to calling and text messaging and photographing, can now be performed from many cell phones. The particular numbers of, and the particular numbers dialed by,

particular cellular telephones can be evidence of criminal activity. Such numbers can confirm identities of particular associates and the occurrence of certain events.

7.      As with most electronic/digital technology items, communications made from an electronic device, such as a cellular telephone or a standard computer, are often saved or stored on the device. Storing this information can be intentional, for example, by saving a text message or a contact or an e-mail. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or cellular telephone. In addition to electronic communications, a user's internet activities generally leave traces in the web cache and internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, stored, deleted, or viewed.

8.      I am aware that criminals sometimes take trophy photographs and videos using their cellular telephones of their contraband, firearms, and proceeds and retain them on their cellular telephones. I am also aware that such criminals, like law-abiding citizens, sometimes take photographs and videos using their cellular telephones of themselves with their friends, relatives, and associates and keep the photographs on their cellular telephones. When they are taken or retained by criminals, such photographs and videos can be evidence, and can lead to additional evidence, of illegal activity by identifying the perpetrators, contraband, and people who are actively assisting and/or supporting the criminal activity as well as the locations where they live or where they store their contraband, firearms, proceeds, or paraphernalia.

9.      I am also aware that cellular phones often include physical location data, indicating where a cellular phone was at a given date and time.  This can be beneficial in an investigation by comparing an individual's cellular phone's location data against known significant events and locations pertinent to a criminal investigation; by comparing the location data from a cellular phone against known dates/locations, investigators can determine whether a phone, and thus likely its user/owner, were at a certain location at a certain date and time.

10.     In addition to traditional location data, your affiant is aware that cellular phones often retain data regarding which wireless internet (WiFi) networks the cell phone was connected to at certain dates and times; therefore, if a cellular phone contains this information, investigators can attempt to research or verify the physical location of that particular WiFi network/connection, and thus determine the general vicinity of the cellular phone on a particular date and time.

11.     I am also aware that the internet search histories of cellular phones often contain evidence of criminal activity.  For example, I am aware that it is not uncommon for individuals who commit crimes to then search the internet to determine what, if any, media coverage there is about the crime.

12.     I am also aware that cellular phones contain a large amount of data that identifies who is the user of a particular cellular phone.  Such data includes text messages, call logs, contacts, social media and email accounts associated with/link to the device, photographs and videos, and other data.  Such evidence is the equivalent of "indicia" evidence commonly recovered during searches of residences and vehicles pursuant to search warrants, as it demonstrates or indicates who the user or users of a particular cellular phone

were, much like "indicia" evidence indicates who is the owner, user, or occupant of a residence or vehicle.

13.     I am also aware that criminals will often utilize their cellular phones to communicate regarding their criminal activities.  These communications can be with friends/associates in which they discuss their criminal activities, as well as coconspirators, to include individuals with whom they share or intend to share proceeds of their crimes.

14.     This affidavit is submitted in support of a search warrant for: One Apple iPhone cellular telephone (**TARGET TELEPHONE #1**), including any memory cards ("SIM") that are in the telephone, which is to be seized from Prasad MARGABANDHU.

15.     **TARGET TELEPHONE #1** is believed to currently be in the custody of MARGABANDHU. As explained below, there is probable cause to conclude that **TARGET TELEPHONE #1** contains evidence of MARGABANDHU's commission of the federal felony offenses listed above.

16.     I have personally participated in this investigation by, among other things, reviewing information such as police reports and associated data, interviewing witnesses, serving grand jury subpoenas.  In addition, I have discussed this case with, and reviewed the reports of other law enforcement officers, including detectives with the Pittsburgh Bureau of Police as well as fellow ATF Investigators.  This affidavit is being submitted for the specific purpose of supporting a search warrant to search **TARGET TELEPHONE #1**.  I have not, therefore, included every fact known to me concerning this investigation.

## II.     PROBABLE CAUSE

17.     The United States is investigating a suspected conspiracy to commit arson and to submit a related fraudulent insurance claim in violation of the captioned federal

statutes within the Western District of Pennsylvania (WDPA). The property which was the subject of the arson and insurance claim was utilized as a rental property and, therefore, should be deemed to be property engaged in and affecting interstate commerce within the meaning of the arson statutes referenced above.

18.     On March 4, 2019, Prasad MARGABANDHU, by way of his company Shane Tracy Enterprises, purchased the 3 story commercial structure at 1925 East Carson Street in Pittsburgh, PA from the estate of William Witting IV.  On May 31st, 2019 the property is transferred from the Witting estate to MARGABANDHU's company.  Two days later, on June 2, 2019, Shane Tracy Enterprises files for bankruptcy listing 1925 East Carson as an asset.  Your affiant notes that Shae Tracy Enterprises is and was wholly owned by MARGABANDHU.

19.     On July 2nd, 2021 in the Court of Common Pleas of Allegheny County, Pennsylvania, Shane Tracy Enterprises (MARGABANDHU) was ordered to pay $63,708 as the result of a judgement in a civil case in favor of the plaintiffs (County of Allegheny, City of Pittsburgh, and School District of Pittsburgh) and against Shane Tracy Enterprises (MARGABANDHU) resulting from unpaid taxes.

20.     On September 28th, 2021 the Court of Common Pleas of Allegheny County ordered that 1925 East Carson Street be exposed to a Sheriff's Sale.  On October 4th, 2021, MARGABANDHU transferred ownership of 1925 East Carson Street from Shane Tracy Enterprises to another entity controlled by MARGABANDHU known as RSP Pittsburgh, which had filed for bankruptcy on September 7, 2021.  This transfer of the property to RSP Pittsburgh, Inc. resulted in the Sheriff's sale of the property being postponed.  On October 20th, 2021, RSP Pittsburgh filed Forms 206A/B Assets in United States Bankruptcy Court

for the Western District of Pennsylvania, listing 1925 East Carson Street as real property. These actions resulted in two additional Sheriff's Sale postponements on December 6th, 2021, and February 7th, 2022.

21.    On March 25th, 2022, MARGABANDHU transferred ownership of 1925 East Carson Street from RSP Pittsburgh back to Shane Tracy Enterprises.  Five days later, on March 30th, 2022, Shane Tracy Enterprises again filed for bankruptcy, listing 1925 East Carson Street as the business address and a real property asset.  As a result, an additional Sheriff's Sale postponement occurred on April 4th, 2022.  On April 8th, 2022, the Shane Tracy Enterprises bankruptcy case was dismissed.

22.    On April 28th, 2022, then Chief Judge Carlotta Böhm entered an Order of Court requiring that MARGABANDHU cause Shane Tracy Enterprises to transfer 1925 East Carson Street back to RSP Pittsburgh by April 29, 2022.  The Order of Court further prohibited the transfer of the East Carson Street Property for a period of 18 months and declared any such transfer in violation of the order null and void ab initio.  Investigators noted a filing dated May 2nd, 2022 by RSP Pittsburgh purporting that 1925 East Carson Street was transferred from Shane Tracy Enterprises to RSP Pittsburgh by a deed dated April 22, 2022.

23.    On May 1st, 2022, Shane Tracy Enterprises filed its third bankruptcy case. In this filing, MARGABANDHU represented that Shane Tracy Enterprises owned the 1925 East Carson Street property.  The bankruptcy court subsequently dismissed the Shane Tracy Enterprises with prejudice as a bad faith filing.  As a result, MARGABANDHU was prohibited from using Shane Tracy as a bankruptcy shield for the East Carson Street Property for the immediate future.  Also, the Order reaffirmed the *in rem* relief regarding

the East Carson Street property, meaning that no other bankruptcy filing – regardless of an averment of ownership of the East Carson Street Property – would stop the taxing bodies' state court actions.  The following day, May 2nd, 2022, after Erie Insurance terminated the policy that covered 1925 East Carson Street, MARGABANDHU purchased an insurance policy on the property from Rockingham Insurance providing coverage in the amount of $924,745, by way of the Spodek, Rupp, and Fiore Agency.

24.     On or about May 5th, 2022, Christopher UMBERGER was released from a period of incarceration at the Central Regional Jail and Correctional Facility in Flatwoods, West Virginia before travelling to the Bluefield, West Virginia area.  On May 6th, 2022, your Affiant identified, by way of cell phone records, that MARGABANDHU and UMBERGER began communication.  Investigation to date has revealed UMBERGER and MARGABANDHU were acquaintances as far back as 2013.

25.     On May 16th, 2022, the third Shane Tracy Enterprises bankruptcy filing was dismissed with prejudice given the "bad faith" nature of the filing.  Shane Tracy Enterprises was subsequently barred from filing for bankruptcy for 24 months.

26.     MARGABANDHU sent $300 to James Smith via CashApp for "tenant eviction pay as agreement" from 133 South 22nd Street in Pittsburgh.  Your Affiant interviewed Mr. Smith in person.  Smith reported to Your Affiant he and his cousin, Justin Williamson, had been tenants of MARGABANDHU at 133 South 22nd Street but had been ordered by MARGABANDHU to move out of their apartment and into 1925 East Carson Street "as soon as possible" because MARGABANDHU was looking to show the building at 133 South 22nd Street to a prospective buyer and sell it as quickly as he could.

Accordingly, Williamson and Smith relocated to 1925 East Carson Street to reside there as tenants of MARGABANDHU.

27.     On June 6th, 2022, 1925 East Carson Street was sold at an Allegheny County Sheriff's Sale to YS, LLC for a high bid of $170,000 during standard business hours. Your Affiant spoke with Allegheny County Sheriff's Deputy and ATF Task Force Officer Tom Leheny regarding the implications of the Sheriff's Sale. It is Your Affiant's understanding that MARGABANDHU was set to lose the property unless, within thirty days from the date of the sale, MARGABANDHU would seek "redemption" relief from the sale.

28.     Also on June 6th, 2022, UMBERGER sent several text messages to his sister, Ruth Black, in the Bluefield, West Virginia area. One such message read "Please don't tell anybody where I'm at". At 8:36pm on this date, UMBERGER sent Black a text message reading "I'm at Parsad's house. He has a Tesla, a new Jeep, a Chevrolet truck, a Chevrolet van, a Cadillac Escalade, a Porsche". Investigators learned that MARGABANDHU had over 30 different vehicles registered to him at the time.

29.     On or about June 7th, 2022, Golan Barak of YS, LLC visited 1925 East Carson Street to inspect the property. Barak encountered Justin Williamson and James Smith, with all parties reporting the encounter as cordial and that Barak was willing to let the two stay on as tenants. Your Affiant personally interviewed Justin Williamson, who claimed that after the encounter he attempted to send multiple text messages to MARGABANDHU that went unanswered. James Smith reported to Your Affiant that he was able to make telephonic contact with MARGABANDHU after the encounter with Barak. On this telephone call, Smith stated MARGABANDHU ordered he and Williamson to move back to 133 South 22nd Street.

30.     On June 10th, 2022, at or about 12:30pm, Barak and his assistant, Daisy Phillips, returned to 1925 East Carson Street after having paid the remainder of the balance on the $170,000 Sheriff's Sale purchase of the property to Allegheny County.  Officers from the Pittsburgh Bureau of Police (PBP) responded to the scene after MARGABANDHU arrived and a heated argument between he and Barak arose.  Your Affiant personally watched the PBP Body Worn Camera (BWC) footage and noted that at the 3 minute and 1 second mark, MARGABANDHU gestured towards Barak and says to the officers "He's not gonna get the deed".

31.     On June 16th, 2022, MARGABANDHU sent an email to Tara Campbell and Marvin Spodek of the Spodek, Rupp, and Fiore Insurance Agency.  This is the agency through which MARGABANDHU purchased the Rockingham Insurance policy for 1925 East Carson Street.  The e-mail message from MARGABANDHU stated "Hello Marvin  I was downloading and organizing all files and noticed on the  questionnaire that asked if RSP was in bankruptcy within 5 years.  The answer is yes because of another property in company name but that bankruptcy is closed and done with and it's not anymore.  Will that be a problem or is that ok   Thanks".  Spodek responded to MARGABANDHU by stating "that should not be problem".

32.     On June 20th, 2022, MARGABANDHU submitted a "Petition for Redemption" to Allegheny County to maintain ownership of 1925 East Carson Street.  This filing operated to delay the transfer of the deed for 1925 East Carson Street to the purchaser from the Sheriff's sale.

**1925 East Carson Street Fire: June 22nd, 2022**

33.     At approximately 3:49am on June 22nd, 2022, a structure fire at 1925 East Carson Street was reported by neighbors.   ATF Certified Fire Investigator Matthew Regentin examined the fire scene and determined that there were at least two separate areas of origin for fires inside 1925 East Carson Street and that the cause of the fire should be classified as "incendiary" (arson). During the ensuing investigation, ATF Investigators queried City of Pittsburgh License Plate Readers and learned that a Ford F-350 (PA License #: ZVB-5436) registered to MARGABANDHU was captured in the area of the fire.  Your Affiant knows that during the Examination Under Oath with Rockingham Insurance, MARGABANDHU testified that this specific vehicle was in the possession of UMBERGER.  MARGABANDHU further testified that UMBERGER was an employee of his, that he was authorized to be driving the vehicle at the time, and that UMBERGER had access to 1925 East Carson Street.  MARGABANDHU denied any knowledge of who set the fire at the building and claimed UMBERGER had no reason to be at the location the morning of the fire.

34.     Specifically, the F-350 was first captured entering the Squirrel Hill Tunnel at or about 3:17am on June 22nd, 2022.  At or about 3:22am the F-350 was captured on a City of Pittsburgh traffic camera as the vehicle was traveling south over the Birmingham Bridge, entering the South Side and approaching East Carson Street.  At 3:23am, the vehicle is captured on a City of Pittsburgh traffic camera traveling west on East Carson Street and making a right turn onto South 20th Street where it travels north.  Exterior camera footage was also reviewed from BM Kramer (BMK), an industrial pipe company, located at 69 South 20th Street, Pittsburgh, PA 15203 just .2 of a mile from 1925 East

Carson Street.   At or about 3:24am, the BMK security video footage captured the vehicle traveling north on South 20th Street then making a U-Turn and heading south before it parks on South 20th Street between Sidney Street and Fox Way in front of BMK.  The location at which the vehicle parked is a short walk around the block from 1925 East Carson Street.  Investigators also reviewed exterior security camera footage (facing West towards South 20th Street) from BMK.  The video footage shows the F-350 parked on South 20th Street at or about 3:25am.  At or about 3:26am, a male, dressed in a dark, short sleeved top and dark pants, wearing a white face covering resembling a medical mask, is captured exiting the vehicle and walking south on South 20th Street towards East Carson Street.  The male is then captured returning to the vehicle at or about 3:37am.

35.    ATF Certified Fire Investigator (CFI) Special Agent (SA) Matt Regentin, who conducted a scene examination to determine the origin and cause of the fire, advised fellow investigators that, in his expert opinion, the arrival of the F-350 near the affected structure area at or about 3:22am, and subsequent departure at or about 3:37am, was within the timeframe consistent with the ignition of the fire at 1925 East Carson Street. In particular, the fire was reported at 3:49am by a neighboring resident reporting smoke. This report is consistent with fire development for a fire to have been initiated inside 1925 East Carson Street between 3:24am and 3:37am.

36.    At approximately 3:37am, the F-350 was captured by BMK security video traveling south on South 20th Street and City of Pittsburgh Traffic Cameras making a right onto East Carson Street where it traveled west directly past 1925 East Carson Street and made a left turn onto South 19th Street.

37.     At or about 3:38am, the vehicle was captured by a City of Pittsburgh traffic camera traveling north on South 20th Street crossing East Carson Street.  Both the BMK security camera and City of Pittsburgh traffic camera captured the vehicle making a right turn on Sidney Street and another right turn on South 21st Street.

38.     At or about 3:39am, a City of Pittsburgh traffic camera captured the vehicle traveling back to East Carson Street where it made a left turn and headed east.

39.     UMBERGER died of a suspected heroin overdose on June 29, 2022, which was one week after the fire.  UMBERGER's sister, Ruth Black, provided UMBERGER's phone to ATF after UMBERGER's death.  Based upon a review of data extracted from UMBERGER's phone by investigators, your Affiant knows that, at 4:08am, UMBERGER's phone searched "police scanner" in the Play Store.  At 4:12am UMBERGER's phone installed the Application "Fire and EMS Scanners".

40.     At 5:35am, UMBERGER answered a phone call from his friend, Jeffrey CANCILLA, which lasted approximately 33 seconds.  CANCILLA has a lengthy criminal record and served time in prison with UMBERGER, at which time they became friends.  At 6:04am, UMBERGER answered another phone call from CANCILLA which lasted approximately 12 minutes and 24 seconds.  CANCILLA, after being granted immunity, reported to investigators that UMBERGER had disclosed to him he had been solicited by MARGABANDHU to set the fire.  CANCILLA stated UMBERGER told him MARGABANDHU had agreed to pay him $10,000 USD to burn the building down.

41.     CANCILLA would later go on to report to investigators that, after UMBERGER's death from a heroin overdose on June 29th, 2022, he contacted MARGABANDHU.  CANCILLA stated he falsely claimed to MARGABANDHU that he

had taken part in setting the fire at 1925 East Carson Street and that, if he didn't receive his cut of the money he would put law enforcement onto MARGABANDHU.  CANCILLA further stated that he subsequently received a cash payment of $2,000 USD from MARGABANDHU as well as multiple cash payments of $500 USD, totaling $5,000 USD in all.  CANCILLA estimated the final $500 USD payment he received from MARGABANDHU was sometime in the summer of 2023.

42.     In his EUO, MARGABANDHU testified that he only uses one phone all the time and that the phone number associated with that phone is 412-607-7675.  The EUO was taken in two parts, on March 23rd, 2023 and on July 27, 2023.  Call Detail Records (CDRs) for this phone were obtained pursuant to a grand jury subpoena.  Upon comparison of the CDRs from MARGABANDHU's phone to the text messages found on UMBERGER's phone, it appears that approximately 436 text messages between MARGABANDHU and UMBERGER , during the time frame of May 6th, 2022 to June 20th, 2022 ,were deleted from UMBERGER's phone.  Your affiant would therefore like to search MARGABANDHU's phone to search for those text messages.  Many of the text messages between UMBERGER and MARGABANDHU which were NOT deleted are described in the following paragraphs.

43.     Review of the CDRs obtained pursuant to grand jury subpoena indicate that on June 22nd, 2022 at 6:20am, UMBERGER called MARGABANDHU and the call showed as "answered" and lasting 6 seconds.  At 6:22am, UMBERGER sent a text message to his sister, Ruth Black, stating "I will be in with Jeff today.  Later. Just sneak in, lay low. Get my birth certificate, etc. Visit you, visit Tim and exit. I've told no one but you.".  At 6:44am, UMBERGER sent a text message to MARGABANDHU stating "I

never got your text until early morning. Sorry. Bigs just removed the dumpster. I was watching the News. Thera a four alarm fire on Carson. My first thought was the black dude's that you moved, who kept breaking in. But, I didn't recognize the building. E Carson is shut down in that area. I'm heading to town. I need to see you. It's going to be 94 [degrees], I'm low on gas. This thing burns.".

44.    At 6:56am, UMBERGER answered a phone call from CANCILLA which lasted approximately 3 minutes and 43 seconds.  At 7:07am UMBERGER sent a text message to Sivram BANDHU stating "Shiv, this is Chris.  I just saw on the news where that property that Prasad owns on East Carson completely burnt last night. Of course he's not up or answering the phone.  I even had Jeff check it and that's definitely the building.  Give me a call at your earliest convenience.".  At 7:25am, UMBERGER called CANCILLA, with the call being answered and lasting approximately 51 seconds.  At 8:00am, UMBERGED called MARGABANDHU, with the call listed as "answered" and lasting 2 seconds.

45.    At 1:24pm, UMBERGER sent a text message to MARGABANDHU stating "What is your estimated time of arrival?" with MARGABANDHU responding saying "Soon.".  At 1:36pm, UMBERGER sent a text message to MARGABANDHU stating "Ok. I told you I wanted to go with Jeff to do some things.  Work with me as best you can.".  At 2:05pm, MARGABANDHU sent a text message to UMBERGER stating "Here.".

46.    At 3:52pm, UMBERGER sent a CashApp payment request to MARGABANDHU for $1,000 USD with the subject line reading "Been working for 12 hours.  Need funds for bills.".  Your Affiant knows that this was 12 hours, almost to the exact minute, after the fire at 1925 East Carson Street was reported to 9-1-1.  Review of

CashApp records showed that this attempted transaction was never paid out, as the status from subpoena returns showed "EXPIRED_WAITING_ON_SENDER", indicating MARGABANDHU never sent the funds via CashApp.

47.     At 4:00pm, UMBERGER sent a text message to MARGABANDHU stating "I explained at 9am to you that I needed funds for me and Jeff to do road trip.  I put $60 in gas in his car, $120 in the truck. Paid Cuba $10 and bought us a pack of smokes. I'm dead broke.  Jeff is pissed at me and I still have 2 hour's or more work yet. You are killing me."

48.     At 4:39pm, UMBERGER sent a text message to MARGABANDHU stating "Please hurry. I'm dead tired. At 1:30 you ask me to wait that we were about done. It's 4:40. Please.".  MARGABANDHU responded to UMBERGER with "Ok".

49.     At 4:53pm, UMBERGER sent a text message to 412-933-9044, an unknown individual listed as "Tee" in UMBERGER's phone, stating "Yes. Shortly. Boss is gone to the bank right now".  Based on review of other text messages, Your Affiant believes "Tee" to be a drug dealer for UMBERGER in the Pittsburgh, PA area.  At 5:52pm, UMBERGER sent a text message to "Tee" stating "I'm coming. Be about 30 minutes".

50.     Review of financial data from PNC Bank by Your Affiant revealed the previously identified PNC Bank Card, Card 4034860016524802, was used to withdraw $600 USD from an ATM at a PNC branch location located at 1612 Lincoln Way in White Oak, PA.  Your Affiant knows that this debit card is the same card linked to MARGABANDHU's CashApp account.  Your Affiant also knows that this ATM location is approximately 2.8 miles, or a 5 minute drive, from 623 Long Run Road in McKeesport, PA.  623 Long Run Road contained "Tube City Brew Works", a MARGABANDHU owned entity, and was also the location where UMBERGER was living in an apartment

above the structure for what investigators believe was the majority of his time in the Pittsburgh area.  As of this writing, Your Affiant has been unable to identify any other similar transactions to the described ATM Withdrawal.

51.    A review of Cellular Record and Geospatial Data Analysis by ATF SA Sonnendecker aided Investigators in identifying MARGABANDHU's movements on the day of the fire.  SA Sonnendecker noted accessed cell sites by MARGABANDHU's phone during the 11:00am hour near MARGABANDHU's listed home at 834 Washington Road, Pittsburgh, PA.  MARGABANDHU's phone then proceeds to access cell sites closer to 1925 E Carson Street, then eventually over into the general area of UMBERGER's residence and the aforementioned PNC Bank ATM Machine for several hours, then back into the area of the residence on Washington Road by around 10:00pm. See below insert for reference:



**After the Fire of June 22nd**

52.     On or about June 22, 2022, MARGABANDHU initiated a claim with Rockingham for losses arising from the fire that occurred earlier that day.  During the processing of that claim, MARGABANDHU caused the United States mail to be used in furtherance of the claim.  Specifically, on or about August 31, 2023, MARGABANDHU's attorney's law firm sent a notarized Errata Sheet relating to MARGABANDHU's Examination Under Oath through the United States mail to an attorney for Rockingham.

53.     On June 25th, 2022 at 1:42pm, UMBERGER sent MARGABANDHU a text message stating "I did not drop the stuff off in Oakland.  I went there. I had no one to help me and the boxes were wet.  Plus I was tired. I did all the extra work because I need to get me a vehicle. (I will still use the truck for work.) You still owe me $350. There is a vehicle [I] want. You can pay them directly. It's four grand. With the three fifty we are even. You owe me zero. For all the work I've done, that's unbelievably low. Plus I'll end up working the whole time you are gonna [gone]".  At 1:43pm, MARGABANDHU responded to UMBERGER stating "Ok. Definitely need a vehicle that's better on gas. Ok".  At 1:44pm, UMBERGER responded to MARGABANDHU stating "Look out for me, help me, and I bet my ass you'll come out ahead.".  Your Affiant knows that the following day, June 26th, 2022, at 7:00pm, UMBERGER sent CANCILLA a text message stating "I'm pissed over Prasad.  He's not trying to pay for the car. He gave me a thousand dollars.".  Your Affiant notes that $1,000 USD and a car valued at $4,000 USD would equal compensation of $5,000 USD, or exactly one half of what CANCILLA reported to investigators as MARGABANDHU having agreed to pay to UMBERGER for the arson.

54.     On June 26th, 2022 at 3:47pm, UMBERGER sent MARGABANDHU a text message which included the following: " My day would be a lot better if you paid that car off. Four thousand makes us square on the back pay, square on everything. It gets 30-40 miles a gallon. One owner. Convertible. I have a cute girl who is going to drive it back. You'll like it. Please send the $4,000 to $ruthblack22 at Cash App. Thank you. Enjoy your time off.".  At 3:59pm, MARGABANDHU responded to UMBERGER by stating "Chris. Don't have money to buy the vehicle yet. When I get back I will arrange for it  Till then you have to spend the gas on truck. The Honda might be available as well.".

55.     On June 26th, 2022 at 7:00pm, UMBERGER sent the previously described text message to CANCILLA in which he reported having been paid $1,000 USD by MARGABANDHU.  At 7:05pm, CANCILLA responded to UMBERGER by stating "He's Nicole and diming you so you piss the money away and have to come back and be his slave.".

56.     On June 27th, 2022 at 10:36am, UMBERGER sent MARGABANDHU a text message stating "You said, 'hope I understand'. It's hard to understand when I do everything you ask. For work I've already done you owe more than double what I ask for. The car I wanted is valued at $9,000. He's a friend and needs money. I came to Pittsburgh to come up some. I'm spending all my money on gas, food, etc. I need a car, clothes, a new phone, and to pay bills. McDonald's will pay me more than I'm making. I'v".  At 10:51am, MARGABANDHU responded to UMBERGER by stating "Chris. Can I talk to you in person.  I will sell the truck and buy the good gas mileage car for u.  Don't worry".

57.     Also on June 27th, at 10:52am, UMBERGER sent MARGABANDHU a text message stating "I've been behind you 100%. You will spin me in a second. You are

suppose to look after people that look after you. The bottom line is you'll always come up

on top. Especially if you keep me happy. Hard for me to be happy when you're not helping

me. I want to bring the driveway sealing rig, do some of your lots. So, you'll see what I

can do.  The club would look so much better. And I'm doing it for free. I'm not trying to

tow it if all it's going to do is cost me money. Please reconsider. I've always been there for

you. I rarely ask for anything. I need and want to buy this car. $ruthblack22 and we are

square.".   At 10:55am, MARGABANDHU responded to UMBERGER by stating "I

promise you will get what you want. I just don't have resources to buy additional vehicles.

But the f350 is worth 6000. I will sell it asap and we'll get the gas mileage vehicle.".

58.     During the investigation, Jeffrey Aniel of Bluefield, WV was identified as

having had reported finding UMBERGER deceased to the Mercer County, WV Sheriff's

Office.  Your Affiant personally interviewed Aniel on two separate occasions, once in

person and once over the phone.  Aniel reported to Your Affiant that UMBERGER had

claimed to have been paid $1,000 USD by his "boss in Pittsburgh" for "some sort of job

he had done" after UMBERGER arrived unannounced at Aniel's home in Bluefield, WV

at approximately 3:00pm or 4:00pm on June 28th, 2022.  Aniel reported that UMBERGER

was upset because his boss had "done him dirty".  Aniel advised to Your Affiant that this

was the first time he had heard or seen UMBERGER say anything negative about his boss

in Pittsburgh.  It was also confirmed that UMBERGER had arrived to Aniel's residence in

the MARGABANDHU owned F-350.

59.     On December 19th, 2022, Your Affiant contacted UMBERGER's sister,

Ruth Black, in Bluefield, WV.  Black detailed that after UMBERGER's death, she was

able to secure the F-350 he had been driving as well as UMBERGER's belongings.  Black

did not know the exact makeup of the contents of UMBERGER's belongings as it all had occurred several months prior and she never fully looked through the items she had due to her emotional state regarding her brother's death.  Black would later willingly turn over multiple items to Investigators, including a cell phone belonging to UMBERGER which investigators were ultimately able to extract data from.

60.    Review of Call Detail Records, text messages (also known as Short Message Service 'SMS' and Multimedia Services 'MMS' records), as well as the data extracted from UMBERGER's phone, by Your Affiant indicate the potential that numerous communications between UMBERGER's phone to MARGABANDHU and CANCILLA may have been deleted.   The earliest text messages between UMBERGER and MARGABANDHU extracted from UMBERGER's phone were from June 20th, 2022 at 5:44pm.  The earliest phone call record extracted from UMBERGER's phone between he and MARGABANDHU was from June 6th, 2022 at 6:08pm, the same date as the Sheriff's Sale of 1925 East Carson Street.  Records from Verizon Wireless indicate UMBERGER and MARGABANDHU's phones to have been in communication prior to these two identified dates.  Specifically, the phones were in communication on the following dates:

- May 6th, 2022

- May 8th, 2022

- May 9th, 2022

- May 17th, 2022

- May 18th, 2022

- May 19th, 2022

- May 30th, 2022

- May 31st, 2022

- June 1st, 2022

- June 2nd, 2022

- June 3rd, 2022

- June 4th, 2022

- June 5th, 2022

61.     On February 7th, 2024, Your Affiant spoke with Matt Rosenberg of the Allegheny County Police Department Mobile Device/Computer Forensic Unit.  Rosenberg is the individual who conducted the extraction of UMBERGER's phone following its recovery from UMBERGER's sister.  Rosenberg reviewed the data with Your Affiant and advised that it appeared possible there were text messages and phone calls that may have been manually deleted from UMBERGER's device.

62.     Your Affiant knows that iPhones, such as **TARGET TELEPHONE #1**, provide users the ability to easily transfer historical data between physical handsets such as when purchasing a new phone.  As such, Your Affiant believes MARGABANDHU's current handset for **TARGET TELEPHONE #1**, even if different from the handset he possessed at or around the time of the fire at 1925 East Carson Street, may still contain information of value to investigators.

63.     Based on the foregoing, there is probable cause to believe that a search of the captioned cellular telephone (**TARGET TELEPHONE #1**), to be seized by Investigators from MARGABANDHU, will reveal evidence of the violations of 18 USC § 844(i) (Arson of Property in Interstate Commerce), 18 USC § 844(n) (Arson Conspiracy), and 18 USC § 1341 (Mail Fraud) committed by MARGABANDHU.

The above is true and correct to the best of my knowledge, information, and belief.

*/s/ Jared L. Berken*
Jared L. Berken
Special Agent - ATF

Subscribed and sworn before me, by telephone,
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 20th day of February, 2024.

_____
THE HONORABLE KEZIA O. L. TAYLOR
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

### <u>Property to be Searched:</u>

1.  One Apple iPhone cellular telephone, with assigned phone number **(412) 607-7675**, possessed by Prasad Margabandhu (**TARGET TELEPHONE #1**), including any memory cards ("SIM") that are in the telephone.

## ATTACHMENT B

### Evidence to be Searched and Seized:

All records, information, data, and evidence regarding violations of 18 USC § 844(i) (Arson of Property in Interstate Commerce), 18 USC § 844(n) (Arson Conspiracy), and 18 USC § 1341 (Mail Fraud) including evidence of who utilized the Device described in Attachment A (**TARGET TELEPHONE #1**) and when, including:

    a. Contact lists, including telephone numbers, names, and images associated with those numbers;

    b. Incoming and outgoing call logs;

    c. Incoming and outgoing text messages (both SMS and MMS), including draft text messages, chats, Facebook messenger chats and other social media chats and communications;

    d. Online searches/search history and sites viewed via internet

    e. Photographs;

    f. Videos;

    g. Sent and received audio files, video files, and image files;

    h. Telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the ESN of the telephone;

    i. Call forwarding information;

    j. Messages drafted but not sent;

    k. Metadata and physical location data;

    l. Emails sent and received, including emails drafted but not sent;

    m. Records/evidence indicating when the Device was powered on and powered off;

    n. Navigation, mapping, and GPS files;

    o. Emails/email accounts associated with the Device;

    p. Social media accounts associated with the Device;

    q. Voice messages;

    r. Video messages; and

    s. Evidence indicating the Device user's state of mind as it relates to the crimes under investigation.